RENDERED: MARCH 23, 2017
TO BE PUBLISHED

𝕾upreme 𝕮ourt of 𝕶entucky

2016-SC-000242-MR

DATE 4/13/17 Kim Redmon,D

ASA PIERATT GULLETT, IV　　　　　　　　　　　　　　APPELLANT

ON APPEAL FROM SHELBY CIRCUIT COURT
V.　　　　　HONORABLE CHARLES R. HICKMAN, JUDGE
NOS. 14-CR-00058 AND 15-CR-00159

COMMONWEALTH OF KENTUCKY　　　　　　　　　　APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**<u>REVERSING AND REMANDING</u>**

Appellant, Asa Pieratt Gullett, IV, appeals from a judgment convicting him of incest, first-degree rape, first-degree sodomy, first-degree sexual abuse, and second-degree sexual abuse and sentencing him to a total of sixty-five years in prison, which is the maximum sentence allowable in this case.

Appellant argues that he is entitled to relief because (1) during voir dire, the juror who ultimately became foreperson improperly withheld material information which would have justified a for-cause challenge or would have prompted Appellant to use a peremptory challenge against her; (2) a directed verdict should have been granted on the first-degree sodomy and first-degree sexual abuse charges because there was a lack of evidence of forcible compulsion; (3) the phrasing of the first-degree sodomy and first-degree sexual abuse instructions resulted in a unanimous verdict violation; and (4) the trial court erroneously permitted the introduction of prior bad act evidence.

Because the jury foreperson wrongfully withheld material information concerning the past criminal record of her close relatives, and the concealment of that information denied Appellant the opportunity to challenge the juror for cause or alternatively, use a peremptory strike to remove the juror, we conclude that Appellant was deprived "of a substantial right" not subject to harmless error analysis. *Shane v. Commonwealth,* 243 S.W.3d 336, 341 (Ky. 2007). For that reason we reverse and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant grew up in Perry County and in 2000, at the age of nineteen, he moved with his parents to Shelby County. In 2003 or 2004, Appellant moved to Maryland. A few years later, Appellant's parents discovered that Appellant had fathered a child in Perry County. That child, who we refer to as Betty,[1] was born in 2000. It was only at this time that Betty, too, first came to know of her father and grandparents.

Betty had a difficult home life, and so in January of 2008, she moved into the Shelby County home of her grandparents, Appellant's parents. They became her permanent guardians. While Appellant was still in Maryland, he began to develop a relationship with Betty by talking with her on the telephone every night. A year later, he returned to Kentucky and resumed living at his parents' home. Appellant began to develop a closer relationship with Betty.

---

[1] In order to protect her privacy we have used a pseudonym in our references to the victim.

According to the evidence, Appellant's interest in Betty became increasingly sexual and his parents began to suspect improprieties. They would later report information to police leading to an investigation. Betty then began to disclose more details of her relationship with Appellant, including details of the crimes that were eventually charged.

Police interviewed Appellant and the suspicions that had arisen based upon Betty's allegations were confirmed. Appellant was initially indicted on one count of first-degree rape, one count of first-degree sodomy, and three counts of first-degree sexual abuse (one count age related and the other two based upon forcible compulsion). He was later separately indicted for one count of incest and that count was joined into the original indictment.

At trial, the court dismissed one count of sexual abuse. The remaining charges were submitted to the jury. Ultimately, the jury convicted Appellant of incest (victim under eighteen years of age); first-degree forcible rape; first-degree forcible sodomy; first-degree forcible sexual abuse; and second-degree sexual abuse. As a result of these convictions Appellant was sentenced to a total of sixty-five years in prison. This appeal followed.

## II. ANALYSIS

### A. Appellant is entitled to a new trial based upon juror misconduct.

We first consider Appellant's contention that he is entitled to a new trial because the jury foreperson, Marla Ethington, lied on her juror qualification form and also during the voir dire proceedings concerning whether a member of her family had ever been prosecuted in a criminal matter. After being

3

summonsed for jury duty, Ethington completed a juror qualification form which included the following question: "Have you or a family member been a defendant, witness, or complainant in a criminal case?" Ethington answered "No."

It is undisputed that Ethington has a brother, a sister, and a nephew who have each been convicted of criminal offenses; and, indeed, her siblings had each served time in prison as a result of previous criminal convictions, and her nephew was currently undergoing a criminal prosecution. Although Appellant's trial counsel, public defender Elizabeth Curtin, was unaware of the relationship, she had previously represented Ethington's siblings in their respective criminal prosecutions, and another lawyer in her office was currently representing Ethington's nephew.

Ethington was not among the jury initially drawn to fill the jury box, but as a member of the reserve pool, she was in the courtroom throughout the voir dire proceedings, and presumably she was aware of the proceedings as they unfolded. During the voir dire examination, the trial court asked the venire if any of them had had any dealings with "[the prosecutor's] office? Friends? *Family?* Anybody that may have had dealings with [the prosecutor's office]?" The question was clearly intended to discover if any prospective juror, personally or indirectly through friends or family, had had dealings with the prosecutor's office. A similar question was asked concerning defense counsel.

After a juror on the venire was excused for cause, another juror, "Juror A," was called to replace him. When the trial court asked Juror A if any of the

questions asked so far indicated a reason for concern, he answered that his stepson had been prosecuted for rape by the prosecutor's office and that defense counsel had been his attorney. Juror A was then excused for cause. Ethington was selected to replace him.

Similarly asked by the trial court if she had "[any] concerns to this point [based upon the questions asked so far]," and even though Juror A had just identified his stepson's prosecution as a concern, for which he was excused for cause, Ethington responded "No."

Later in the voir dire process, the Commonwealth asked whether "anyone had a *family member*, friend, or close acquaintance that's been a witness, a victim, or a defendant in a criminal case." Ethington again failed to disclose that she had a brother, a sister, and a nephew who had been prosecuted for criminal conduct. The Commonwealth then asked specifically whether anyone in the second row, where Ethington was seated, had a "friend or *family member* who was a witness or charged with a crime," and then repeated "witness, victim, or *defendant?*" Another juror responded that she had a friend who was prosecuted, but again, Ethington did not disclose the prosecutions of her close relatives.

It was not until after Appellant's convictions that defense counsel learned of the prosecutions of Ethington's relatives. Based upon that discovery and other reasons not relevant here, Appellant moved for a new trial. At the hearing on Appellant's motion, the court records establishing the prior prosecutions of Ethington's relatives were introduced. The validity of those

5

records is not in dispute. Ethington was called as a witness to explain her failure to respond to the voir dire questions. She explained that she construed the questions about her family to mean only members of her present household, which consisted of her, her son, and her daughter, and therefore did not include her siblings, nephew, and other family members outside of her immediate household. She further testified that she was not deliberately trying to mislead anyone about the criminal backgrounds of her siblings and nephew, and that everyone in the county knew her and so she supposed the prosecutors and defense counsel would have known the relevant information without her assistance. She further testified that the undisclosed backgrounds of her kinsmen did not have any impact on her deliberations in the case, and did not create any bias in her one way or the other.

Defense counsel explained at the hearing that she had actively represented a brother and sister of Ethington's, and that her office was currently representing a nephew. Defense counsel explained that if she had known of Ethington's relationship to her other clients, she would have challenged her for cause or used a peremptory challenge to remove her. Defense counsel also said: "During the course of my representation [of Ethington's siblings] I have knowledge that would have precluded me . . . I would never have allowed her to serve, not only serve but be the jury foreperson."

Defense counsel added that truthful responses identifying the relatives "was essential to our ability to select a fair and impartial jury." She further

stated, "I've been practicing out here for over 20 years [and] not a year goes by an Ethington is not in court."[2] Finally, defense counsel reiterated that the fact that the information was not disclosed impacted "our ability to select . . . a fair and impartial jury."

The Commonwealth argued that the burden was on the defendant to prove "actual bias," and that with greater diligence Appellant could have found out the information before trial, or could have asked better questions during voir dire to have obtained the information.

The trial court concluded that Appellant had the burden of showing actual bias in order to obtain relief; that Ethington denied having a bias, but even so, one would expect her bias to run against the Commonwealth since it was the prosecutors who had taken actions against her family members; that Ethington had simply misconstrued "family members" to mean "household members"; and that the jury disclosure form read "Have you or *a* family member . . . ?" rather than "Have you or *any* family member . . . ?" Based upon these factors, the trial court denied Appellant's motion for a new trial.

On appeal, the factual findings of the trial court "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. A factual

---

[2] At this point Ethington, who was present in the courtroom, created a disturbance and was told by the court "you need to be seated." That spontaneous outburst suggests a sensitivity concerning the criminal backgrounds of her relatives, and may suggest a reason for her reluctance to volunteer this information publicly during the trial proceedings.

7

finding is not clearly erroneous if it is supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Substantial evidence is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence . . . has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* at 354. We review issues of law de novo. *Nash v. Campbell County Fiscal Court*, 345 S.W.3d 811, 816 (Ky. 2011).

We first address the trial court's conclusion that Ethington's failure to disclose the criminal prosecutions of her family was not deliberate deception. On the juror qualification form and several times during the voir dire examination, the questions posed asked straight-forwardly whether a family member, friend or acquaintance had been involved in a criminal prosecution. There is no ambiguity surrounding this inquiry, especially when it was asked several times. Among the first rudiments of personal knowledge and identity a person obtains is that a sister and brother are among "family members." That familial status is not lost when siblings live in separate households. It is commonly understood that siblings residing in a different household are, nonetheless, members of the same family. It is equally certain that Ethington knew of her siblings' prior criminal prosecutions. Consequently, at least as to her failure to admit kinship to her siblings, the conclusion that Ethington's silent dissembling did not mislead counsel and the court is not supported by evidence of sufficient probative value to induce conviction in the minds of reasonable men. We cannot disregard the obvious. Ethington was deliberately

8

deceptive in her responses concerning whether members of her family had been involved with the criminal justice system.

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), a personal injury action, the jury venire on voir dire was asked if "any members of your immediate family sustained any severe injury . . . that resulted in any disability or prolonged pain and suffering, that is you or any members of your immediate family?" *Id.* at 550. Juror Payton failed to respond even though it was determined after trial that Payton's son had been injured in the explosion of a truck tire. Juror Payton apparently believed that his son's broken leg resulting from the incident did not fall within the scope of the question. In addressing whether the plaintiffs were entitled to a new trial based upon the juror's failure to respond, the Supreme Court held:

> To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. . . . *We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.*

*Id.* at 556 (emphasis added).

This Court followed the *McDonough* rule in *Brown v. Commonwealth*, 174 S.W.3d 421, 430 (Ky. 2005) ("It is well settled that '[t]o obtain a new trial because of juror mendacity, 'a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that

9

a correct response would have provided a valid basis for a challenge for cause.'" (quoting *Adkins v. Commonwealth*, 96 S.W.3d 779, 796 (Ky. 2003))). We agree that "the necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious." *McDonough*, 464 U.S. at 554.

It is virtually certain that an honest answer from Ethington would have resulted in a valid dismissal for cause because just moments before she was seated, the trial court summarily struck Juror A for cause for precisely the same reason - his close kinship to a defendant in another criminal case. The significance of that subject of inquiry cannot be doubted. Not only does the question appear on the juror qualification form published by the Court of Justice for statewide use in all cases, every trial participant in this case who could inquire about it during voir dire did so. The trial judge asked it directly during his opening questions, and the prosecutor and defense counsel each addressed the subject with the jury, even to the extent of taking a row-by-row poll of the jurors.

We do not have a rule that kinship to a criminal defendant in another case is, per se, grounds to strike a juror for cause. In its discretion, the trial court during voir dire seems to have taken that approach and we have no criticism of it. The attention given to the subject in this case by the court and by counsel, and its inclusion on the juror qualification form, proves beyond doubt that it presents a matter of serious concern about likely bias or prejudice, but it is one that a literal application of the *McDonough* test fails to address.

We agree with the concurring opinion of Justices Blackmun, Stevens, and O'Conner in *McDonough* that "the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." *Id.* at 556. Whether Ethington actually had a disqualifying bias for or against either party because her sister, brother, and nephew had been criminal defendants in other cases may be open to question. However, her dishonesty is a strong indicator of bias, a point reinforced by her emotional outburst when the criminality of her family was mentioned in open court. *See* footnote 2.

The real problem with Ethington's mendacity is that her deceptive silence blocked all further inquiry into the subject. Her tacit dishonesty prevented the trial court and counsel from asking the additional questions needed to ascertain whether she harbored disqualifying biases against Appellant's prosecutors or defense attorneys based upon their respective roles in her family's troubles. Consequently, the test for obtaining a new trial based upon juror mendacity cannot be limited to showing that "a correct response would have provided a valid basis for a challenge for cause." Often, existing bias or prejudice cannot be exposed by simply reversing the false answer to one question. The test for obtaining a new trial, therefore, may also be satisfied by showing that the juror's dishonesty prevented inquiry into a critical subject that may have exposed a disqualifying bias or prejudice.

In addition to the effect of Ethington's deception on Appellant's ability to challenge her for cause, we do not overlook the fact that her mendacity also affected Appellant's right to freely exercise his peremptory strikes. Appellant's

11

trial counsel made it clear that had she known of the relationship, she would have removed Ethington with a peremptory strike based upon knowledge acquired during her representation of Ethington's relatives. We noted in *Shane v. Commonwealth* that, unlike the federal courts, Kentucky law regards the right to exercise peremptory strikes as a substantial right not subject to harmless error analysis. 243 S.W.3d 336, 340-341 (Ky. 2007).

The detrimental effect of juror mendacity on the free and fair use of a peremptory challenge is no less egregious than its effect on the inability to make a challenge for cause. In *Olympic Realty Co. v. Kamer*, 141 S.W.2d 293, 297 (Ky. 1940), two jurors who were intimately acquainted with a key witness failed to disclose that information despite a direct question on the point during voir dire. Our predecessor Court in *Kamer*, 141 S.W.2d at 297-298, reiterated the principles adopted in *Drury v. Franke*, 57 S.W.2d 969, 984-985 (Ky. 1933) (citing *Shulinsky v. Boston & Maine R. R. Co.*, 139 A. 189 (N.H. 1927)), a passage we find well-worth recalling here:

> When the right [to challenge a juror] is lost or impaired, the statutory conditions and terms for setting up an authorized jury are not met; the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned; a litigant cannot be compelled to make a peremptory challenge until he has been brought face to face in the presence of the court, with each proposed juror, and an opportunity given for such inspection and examination of him as is required for the due administration of justice; the right to reject jurors by peremptory challenge is material in its tendency to give the parties assurance of the fairness of a trial in a valuable and effective way; the terms of the statutes with reference to peremptory challenges are substantial rather than technical; such

12

rules, as aiding to secure an impartial, or avoid a partial, jury, are to be fully enforced; the voir dire is of service not only to enable the court to pass upon a juror's qualifications, but also in assisting counsel in their decision as to peremptory challenge; the right of challenge includes the incidental right that the information elicited on the voir dire examination shall be true; the right to challenge implies its fair exercise, and, *if a party is misled by erroneous information, the right of rejection is impaired; a verdict is illegal when a peremptory challenge is not exercised by reason of false information; the question is not whether an improperly established tribunal acted fairly, but it is whether a proper tribunal was established; if false information prevents a challenge, the right is so disabled and crippled as to lose its essential value and efficacy, as to amount to its deprivation;* the fact that a juror disqualified either on principal cause or to the favor has served on a panel is sufficient ground for setting aside the verdict, without affirmatively showing that that fact accounts for the verdict; it is highly important that the conflicting rights of individuals should be adjudged by jurors as impartial as the lot of humanity will admit; next to securing a fair and impartial trial for parties, it is important that they should feel that they have had such a trial, and anything that tends to impair their belief in this respect must seriously diminish their confidence and that of the public generally in the ability of the state to provide impartial tribunals for dispensing justice between its subjects; *the fact that the false information was unintentional, and that there was no bad faith, does not affect the question, as the harm lies in the falsity of the information, regardless of the knowledge of its falsity on the part of the informant; while willful falsehood may intensify the wrong done, it is not essential to constitute the wrong;* that the injury is brought about by falsehood, regardless of its dishonesty, and the effect of the information is misleading, rather than a purpose to give misleading information is the gist of the injury; *when the fact appears that false information was given, and that it was relied upon, the right to a new trial follows as a matter of law.*

(Emphasis added.) *See Leadingham v. Commonwealth,* 201 S.W. 500 (Ky. 1918) (where a juror was in fact related to the deceased, one convicted by the jury of which he was a member was entitled to reversal, unless the juror was in fact ignorant of the relationship, and the burden was on the state to show that he was ignorant of such fact); *Pennington v. Commonwealth,* 316 S.W.2d 221,

13

224 (Ky. 1958) ("[I]t is a requirement for the due administration of justice that revelation be made of material and significant facts affecting the qualification of a juror in order that a party may, if he desires, exercise his right of peremptory challenge." (citation omitted)); and *Anderson v. Commonwealth*, 864 S.W.2d 909 (Ky. 1993) (juror's failure to reveal, in response to voir dire question, that he was relative of complainant's boyfriend, mandated that defendants be granted new trial, regardless of whether juror failed to respond intentionally or inadvertently); *but cf. Moss v. Commonwealth*, 949 S.W.2d 579, 581 (Ky. 1997) ("[I]t is entirely speculative and quite possibly self-serving for appellant to assert that he would have used a peremptory challenge to exclude this juror. If we allowed such a practice, after-acquired information could always be used in post-trial assertions that a particular juror would have been excused had the undisclosed information been known.").

Upon application of the above authorities, we are constrained to conclude that Appellant should have been granted a new trial. The alternative is to uphold a sixty-five year prison sentence imposed by a jury led by a foreperson who remained deceitfully silent when asked, on no less than four occasions, about an important fact regarding her qualifications to serve. Under the most fundamental precepts of due process and fairness, such a conviction may not be allowed to survive.

Ethington's deception regarding the criminal background of her close family members, whether intentional or not, deprived Appellant of the opportunity to either have Ethington stricken for cause, or, alternatively, to

14

exercise a peremptory strike against her. The judgment of the circuit court is accordingly reversed. We address the remaining issues raised by Appellant insofar as they may arise upon retrial.

## B.    Appellant was not entitled to a directed verdict.

Appellant contends that a directed verdict should have been granted on the first-degree forcible compulsion sodomy charge and the first-degree forcible compulsion sexual abuse charge because there was a lack of evidence of forcible compulsion as to each charge.[3] We address this issue because if the evidence at trial was not sufficient to warrant his conviction under the applicable standards, retrial of the case is barred on double jeopardy grounds. For the reasons explained below we reject this argument and conclude that Appellant may be retried upon these charges.

In reviewing a motion for a directed verdict the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. *Id.* For the purpose of ruling on the motion, the trial court must

---

[3] While Appellant frames this argument as being entitled to a "directed verdict," he actually challenges only the forcible compulsion element of the charge, in the absence of which he would still be subject to conviction for age-related statutory sexual charges. Accordingly, more accurately he is contending that instructions for first-degree sodomy and sexual abuse should not have been given, not that he is entitled to an absolute acquittal by a directed verdict. However, because the same result is obtained and that is how the issue has been briefed, we will apply the directed verdict standard in our analysis.

assume that the evidence for the Commonwealth is true, but reserve for the jury questions as to the credibility and weight to be given to such testimony. *Id.* "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). "[T]here must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Benham*, 816 S.W.2d at 186–187; *Banks v. Commonwealth*, 313 S.W.3d 567, 570 (Ky. 2010).

*1) First-Degree Sodomy*

We first consider whether Appellant was entitled to a directed verdict on the first-degree sodomy charge which allegedly occurred in March of 2012. KRS 510.070 provides as follows:

> (1) A person is guilty of sodomy in the first degree when:
>
> (a) *He engages in deviate sexual intercourse with another person by forcible compulsion . . . .*

(Emphasis added.) KRS 510.010(2) defines forcible compulsion as follows:

> 'Forcible compulsion' means physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition.

16

In our prior interpretations of this section we have concluded that "'forcible' compulsion does not require violence or duress or resistance by the victim." *Jenkins v. Commonwealth,* 496 S.W.3d 435, 446 (Ky. 2016) (citing *Gibbs v. Commonwealth,* 208 S.W.3d 848, 856 (Ky. 2006) (discussing statutory amendments in 1988 and 1996 eliminating any requirement that the victim resist her attacker and holding that, in that case, the defendant's "act of taking [the victim's] hand and placing it on his penis" satisfied the physical force element for purposes of a directed verdict motion)).

The Commonwealth alleged that Appellant, who was six feet, two inches tall and weighed over 300 pounds, committed sodomy in March of 2012 when he performed oral sex (deviate sexual intercourse) on Betty, who was less than five feet tall and weighed a third of what Appellant weighed. Betty testified to the act of oral sodomy and she described her effort to resist Appellant's advances and to push him off of her. She explained that he succeeded only after she got "just so tired of trying to fight it" that she just "let it happen." That testimony satisfies the Commonwealth's burden for overcoming a directed verdict on that charge.

### 2) First-Degree Sexual Abuse

Appellant further contends that he was entitled to a directed verdict on the first-degree sexual abuse charge which allegedly occurred in Betty's bedroom in January of 2012. Betty testified that Appellant entered her room wearing only boxer shorts, got into bed with her and asked her to remove her pants. Betty removed her outer shorts but kept on a pair of spandex

17

undershorts. She resisted Appellant's attempt to pull down the spandex shorts but he persisted. According to Betty, Appellant's persistent effort caused her to touch his penis "open-handedly," as she described it, causing Appellant to attain an erection.

KRS 510.110 provides that:

(1) A person is guilty of sexual abuse in the first degree when:

(a) *He or she subjects another person to sexual contact by forcible compulsion . . . .*

(Emphasis added.) Betty's testimony satisfies the Commonwealth's burden for overcoming a directed verdict on that charge.

Accordingly, we conclude that Appellant was not entitled to a directed verdict and that a retrial of the foregoing charges is not barred.

## C. Upon retrial, the jury instructions must be redrafted to assure jury unanimity.

Because the issue may arise upon retrial, we address Appellant's argument that the jury instructions for first-degree sodomy and first-degree sexual abuse resulted in a unanimous verdict violation. We agree with Appellant on that point.

"Section 7 of the Kentucky Constitution requires a unanimous verdict." *Wells v. Commonwealth*, 561 S.W.2d 85, 87 (Ky. 1978). "A violation of this provision may occur in several ways; however, as relevant here and as we explained in *Johnson*, a general jury verdict based upon a single instruction convicting a criminal defendant of a crime when two or more separate instances of that single crime were presented at trial violates the requirement

18

of a unanimous verdict." *Ruiz v. Commonwealth*, 471 S.W.3d 675, 678 (Ky. 2015), as modified (Oct. 29, 2015) (citing *Johnson v. Commonwealth*, 405 S.W.3d 439, 449 (Ky. 2013)). "The clear import of *Johnson* is that a verdict is not unanimous unless all of the jurors based their conviction of the defendant on the same criminal act; and that the instructions and verdict forms must be couched in language that eliminates any ambiguity regarding the jury's consensus." *Id.*

*1) First-Degree Sodomy Instruction*

The first-degree sodomy instruction under which Appellant was found guilty referenced specifically the March 2012 event and was intended to refer to Appellant's act of oral sex on Betty. However, as Appellant notes, Betty's testimony also included on the same occasion, Appellant's demand that Betty perform oral sex on him, and she complied. That act also constituted sodomy as defined in the jury instruction but Appellant was not charged with that act. The jury instructions given did not distinguish between the two acts or inform the jury as to which act was being prosecuted. Consequently, it cannot be concluded with any certainty that the jurors unanimously agreed upon the same act when reaching their verdict. Upon retrial, assuming the evidence to be substantially the same, the instructions must describe more specifically the particular act for which Appellant was charged. The phrase "engaged in deviate sexual intercourse with B.N. *by performing oral sex on [Betty]*" would adequately distinguish between the two acts of sodomy which occurred in the March 2012 episode.

19

*2) First-Degree Sexual Abuse Instruction*

The relevant first-degree sexual abuse instruction specifically referred to the January 2012 episode and was intended to refer to the event Betty testified to when she touched Appellant's penis "open-handedly." Appellant's statement to the police referred to a second touching of Betty's hand on Appellant's penis when he had her stimulate him to ejaculation. Betty's testimony confirmed that incident. Upon retrial the instruction on this charge should be phrased so as to more clearly direct the jury that the instruction is in relation to Betty's testimony that in January 2012 she touched Appellant's penis "open-handedly."

**D.    KRE 404(b) issues**

Appellant next contends that in violation of KRE 404(b), the trial court allowed the Commonwealth to introduce five instances of prior bad acts he had committed. Appellant concedes that four instances were not preserved, and so he requests review of those under the palpable error standard of RCr 10.26.

The preserved error relates to the evidence of the January 2012 uncharged act of sodomy when Betty stimulated Appellant's penis. KRS 404(a) prohibits the introduction of "[e]vidence of a person's character or a trait of character . . . for the purpose of proving action in conformity therewith on a particular occasion[.]" However, KRE 404(b) provides an exception to KRE 404(a) as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purpose, such as proof of motive, opportunity, intent,

20

preparation, plan, knowledge, identity, or absence of mistake or accident.

We have observed that prior acts committed against the same victim, similar to the conduct on trial, will often if not usually, have relevance other than merely establishing a propensity to commit the crime charged, thus falling within the KRE 404(b) exception. *Driver v. Commonwealth*, 361 S.W.3d 877, 884 (Ky. 2012). Betty's testimony that she previously fondled Appellant's penis is relevant to prove the motive and intent of the act charged. We find no error in its admission as evidence.

We decline to address the instances of unpreserved error. Because no objection was made at trial, we have no trial court ruling on the issue to review. Since the case is remanded for further proceedings in the trial court, Appellant will have a sufficient opportunity to secure the trial court's ruling if the same evidence is proffered by the Commonwealth upon retrial.

## III. CONCLUSION

For the foregoing reasons, the judgment of the Shelby Circuit Court is reversed and the matter is remanded for a new trial.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, and Wright, JJ., concur. VanMeter, J., concurs in result only.

21

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General