RENDERED: DECEMBER 19, 2019
TO BE PUBLISHED



# Supreme Court of Kentucky

2018-SC-000237-MR

DATE 1/17/2020

PRESTON WRIGHT            APPELLANT


ON APPEAL FROM BARREN CIRCUIT COURT
HON. JOHN T. ALEXANDER, JUDGE

V.            NO. 16-CR-00192


COMMONWEALTH OF KENTUCKY            APPELLEE


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Preston Wright challenges his conviction in Barren Circuit Court of one count of first-degree sodomy, victim under twelve years old, and resulting forty-year sentence. The only issues presented by this appeal are: (1) did a juror's failure to disclose that she went to school with Wright's sister-in-law during *voir dire* entitle Wright to a new trial; (2) did the trial court commit reversible error by dismissing a juror as the alternate instead of declaring a mistrial; and (3) did the trial court coerce the jury into reaching a verdict by issuing two *Allen* charges. After careful review, we affirm.

# I.   FACTUAL AND PROCEDURAL BACKGROUND

Wright was charged with one count of sodomizing his then-girlfriend's five-year-old daughter Tammy.[1]  Because the issues raised on appeal are limited to the circumstances surrounding a juror's (Juror C) dismissal and the jury's deliberations, we will not discuss the details of the crime itself.

## A. Juror C's Dismissal

The first person to testify at trial was Tammy's biological father.  When his testimony concluded, the court recessed for lunch.  After lunch, the defense reported that several people made allegations against Juror C during the lunch break.  They alleged that Juror C knew Wright; that she sat with Tammy's father and a group of people, presumably his family, during the lunch recess; and that she hugged Tammy's father on the courthouse steps before the court came back from recess.  Therefore, out of the presence of the rest of the jury, the court discussed the allegations with Juror C, the Commonwealth, and defense counsel.

First, when asked whether she knew Wright, Juror C said she did not, but she did know his sister-in-law.  His sister-in-law was a grade ahead of her in school, but Juror C said she did not "*know* know" her.  She stated she saw her around town occasionally but could not recall the last time she spoke to her.  The trial court then asked why she did not disclose this information

---

[1] This pseudonym is used to protect the child's privacy.

during *voir dire.* She responded that she was going to but counsel moved on to their next question before she could.

The court went on to ask Juror C if she sat with Tammy's father and his family at lunch, and she admitted she did sit at the same table. She explained that she was sitting by herself in a Subway Restaurant[2] near the courthouse at a table where three small tables were pushed together. Tammy's father and about six other people asked if they could sit there, and she told them they could. However, Juror C maintained that she did not say anything else to them; she simply finished eating in silence and left.

Finally, Juror C denied hugging Tammy's father on the courthouse steps. She said she was standing on the steps and he walked past her, hugged a woman Juror C did not know, and got into his car and left.

Following this, the trial court sent Juror C back to the jury room and had a discussion with counsel about how they wished to proceed.[3] The trial court stated that it did not believe Juror C's knowledge of Wright's sister-in-law as she described it would have qualified her to be struck for cause. Defense counsel said twice during the discussion that he "agree[d] with that 110%," and that "none of that worr[ied] [him] at all."

However, defense counsel moved for a mistrial based on the lunchtime allegations. First, he was concerned that Juror C purportedly talked to a

---

[2] The trial court indicated that this Subway was the only place one could "go and eat in an hour and get back [to the courthouse]."

[3] Defense counsel did not request that the court question the people who made the allegations against Juror C, and the trial court did not do so *sua sponte.*

3

testifying witness, which would have been inappropriate in and of itself. He also argued it was therefore possible that she tainted the other members of the jury with information she gained during that conversation. The Commonwealth responded that a mistrial was the most severe remedy available and that it would be better to strike her as the alternate and continue the trial with twelve jurors.[4]

Ultimately, the trial court accepted the Commonwealth's position and immediately dismissed Juror C. Then, in order to address the defense's concern about her tainting the rest of the jury, the court asked the remaining members of the jury if any of them received any improper information from Juror C. The members responded they did not, and the trial proceeded.

## B. **Jury Deliberations**

On the second day of trial the jury began its deliberations at about one o'clock. An hour later the jury requested, and was permitted, to see the video of Tammy's testimony again. The jury went back in to deliberate at 2:38 PM.

At 3 PM the foreperson told the court that several jurors were "not comfortable making a decision yea or nay, guilty or not guilty, based on the evidence." The judge admitted he had never encountered that situation before and wanted to talk to counsel about their preferred course of action. The judge suggested reading through the instructions again, telling the jury to think about those instructions, and to make it clear that each individual juror had a

---

[4] The trial court empaneled thirteen jurors prior to trial.

duty to either vote guilty or not guilty; that they could not abstain from voting altogether. The Commonwealth agreed, but the defense argued that the only thing they could do was to bring the jury out, read the *Allen* charge to them and send them back in, or declare a mistrial. The judge replied that an *Allen* charge is read to a deadlocked jury, and that was not what they had. They simply had jurors that were unwilling to vote either way. The judge further noted that juries come out with questions all the time about a myriad of things, and the court has options beyond reading them an *Allen* charge.

So, at 3:08 PM the court explained to the jury that they each had an individual obligation to vote guilty or not guilty based on the instructions and the evidence. He told them that if they reached a point where everyone voted and it was not unanimous, then they could let the court know and they would deal with that issue. He then sent them back in to deliberate.

At 3:24 PM the foreperson reported that everyone had voted, but they were now deadlocked. The judge read them the *Allen* charge verbatim and sent them back in to deliberate at 3:26 PM.

At 3:46 PM the foreperson informed the court that they had another issue. Anticipating that they were still deadlocked, the court asked counsel what they wanted to do if that was indeed the case. The Commonwealth suggested asking the foreperson if he thought further deliberations would be helpful, while the defense suggested declaring a mistrial. The court proposed telling the foreperson the court's only two options were to either read the *Allen*

charge again and continue deliberations or declare a mistrial and get the foreperson's opinion. The defense agreed.[5]

The court therefore asked the foreperson if he thought there would be any utility in having them deliberate further. The foreperson said that if the court would have asked him that an hour ago, he would have said no. But a few jurors had changed their opinion, while a couple of jurors were holding firm. The trial court then brought the jury out and explained that he was not trying to "twist their arm," but that he was required to read the *Allen* charge again because they were still deadlocked. He read it again verbatim and said "I'll ask you to return to the jury room and continue your deliberations. I'm not asking for a specific amount of time. If and when you come to a decision one way or the other or convince yourselves you're at an intractable spot, then just let us know and we'll go from there, okay?" The jury was sent back in to deliberate at 3:57 PM.

At 4:58 PM, the foreperson came out and asked if the judge could provide a definition of "reasonable doubt." The judge explained that he could not, that what constitutes reasonable doubt is a judgment call for each individual juror. The foreperson went back to deliver the court's answer at 5 PM.

At 5:11 PM, after a total of four hours of deliberation, the jury came back with a guilty verdict.

---

[5] For the sake of clarity: the defense only expressly agreed to presenting those two options to the foreperson. He did not agree to reading the jury the *Allen* charge at that time.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. The argument that Wright is entitled to a new trial based on Juror C's failure to disclose on *voir dire* was not properly preserved for appellate review.

On appeal to this Court, Wright first argues that Juror C's failure to disclose that she went to school with his sister-in-law during *voir dire* is structural error and he is therefore entitled to a new trial. However, this argument was not properly preserved for our review.

As discussed, *supra,* when the trial court stated it did not believe Juror C's knowledge of Wright's sister-in-law would qualify her to be struck for cause, defense counsel said he "agreed with that 110%" not just once, but twice. He even went further and stated that the *voir dire* issue did not worry him at all. Defense counsel did move for a mistrial during the same colloquy, but he did so only in relation to the allegation that Juror C was seen talking to and hugging Tammy's father during the lunch recess. Defense counsel never argued she was an improperly seated juror and even agreed with the trial court's conclusion that she was properly seated.

Thus, this alleged error was waived. The defense waived this issue by failing to move for a new trial based on its inability to strike Juror C for cause or to fully exercise its peremptory strikes because he was not made aware of

Juror C's knowledge of the defendant's sister-in-law during *voir dire*.[6] We therefore decline to address this alleged error. Nevertheless, because Juror C was immediately struck and therefore did not participate in the verdict, and because there was no indication from the jury she tainted another member in any way, we would be hard-pressed to find reversible error even if the issue was preserved.

## B. The trial court did not commit reversible error by dismissing Juror C instead of declaring a mistrial.

Wright's next argument is that the trial court committed reversible error by dismissing Juror C in lieu of granting a mistrial based on the allegations that she sat with and hugged Tammy's father during lunch recess on the first day of trial. This error was properly preserved by defense counsel's motion for a mistrial based on those allegations.[7]

Trial courts have broad discretion in determining whether a mistrial should be granted.[8] We review a trial court's denial of a mistrial for abuse of discretion.[9] A trial court abuses its discretion when it acts arbitrarily,

---

[6] *See Gullett v. Commonwealth*, 514 S.W.3d 518, 522 (Ky. 2017).

[7] "[I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which that party desires the court to take[.]" Kentucky Rule of Criminal Procedure (RCr) 9.22.

[8] *Tabor v. Commonwealth*, 948 S.W.2d 569, 571 (Ky. App. 1997).

[9] *Slone v. Commonwealth*, 382 S.W.3d 851, 858 (Ky. 2012).

unreasonably, unfairly, or in a way that is unsupported by sound legal principles.[10] Regarding whether a trial court should grant a mistrial:

> It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial **and the prejudicial effect can be removed in no other way.**[11]

With the foregoing principles in mind, we hold that the trial court did not abuse its discretion by denying Wright's motion for a mistrial.

Wright identified two potential sources of prejudice regarding the lunchtime allegations against Juror C. The first was that she sat and spoke with Tammy's father, a witness in the case, and was also later seen hugging him. The trial judge did not make a finding that these allegations were true, but nonetheless "out of an abundance of caution" immediately dismissed Juror C before proceeding with the rest of the trial. Because she was struck, she did not hear any more evidence, deliberate, or provide a vote of guilty or not guilty. Therefore, any potential prejudicial effect that may have stemmed from that alleged improper contact was remedied by her dismissal.

The second source of potential prejudice identified by Wright was that Juror C could have tainted the other members of the jury with any information gained through her alleged conversation with Tammy's father. The trial court

---

[10] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[11] *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996) (emphasis added).

9

addressed that potential taint by asking the jury if they gained any inappropriate information from Juror C. None of the jurors answered in the affirmative. It is within a trial court's discretion to believe jurors answer such questions truthfully.[12] Therefore, it is clear to us that the trial court did not abuse its discretion by denying Wright's motion for a mistrial. A mistrial would have been an improper solution, as all the complained of conduct by Juror C that could have resulted in prejudice to Wright was properly cured by dismissing her as an alternate and questioning the jury.

## C. The trial court did not coerce the jury into reaching a verdict.

Wright's final arguments revolve around the trial court giving the jury two *Allen* charges. An *Allen* charge is a supplemental jury instruction that a trial court is permitted to read to a deadlocked jury. The *Allen* charge derives its name from *Allen v. United States*, in which the United States Supreme Court approved of a trial court encouraging a jury to continue deliberations after it reported itself deadlocked.[13] Kentucky's version of the *Allen* charge is codified by RCr 9.57:

> (1) If a jury reports to a court that it is unable to reach a verdict and the court determines further deliberations may be useful, the court shall not give any instruction regarding the desirability of reaching a verdict other than one which contains only the following elements:

---

[12] Indeed, during its discussion with defense counsel on the matter the trial court stated, "[a]t some point we have to trust that these people are going to do what you tell them to do. The jury could all sit back there and ignore everything that I ever tell them, and until I get some indication that that's what they're doing I'm not going to jump to that conclusion. I'm not going to impugn their integrity."

[13] 164 U.S. 492 (1896).

(a) in order to return a verdict, each juror must agree to that verdict;

(b) jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(c) each juror must decide the case, but only after an impartial consideration of the evidence with the other jurors;

(d) in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous; and

(e) no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors, or for the mere purpose of returning a verdict.

With this in mind, Wright's argument to this Court is threefold: (1) the trial court's first charge to the jury was, in effect, an *Allen* charge; (2) that the trial court coerced the jury into reaching a verdict by giving it multiple *Allen* charges; and (3) that this Court should adopt a rule that a trial court's giving of more than one *Allen* charge is *per se* coercive. We will address each argument in turn.

### i. Judge's Directive that Each Juror Must Vote Guilty or Not Guilty

Wright first argues that the first time the trial court addressed the jury, after the foreperson reported a few jurors were refusing to vote, what the court gave was in effect an *Allen* charge. Therefore, he reasons, the trial court gave a total of three *Allen* charges. We disagree. The issue that the foreperson reported to the court at that time was not that the jury was deadlocked, i.e. that each juror voted, and the verdict was not unanimous. Rather, he reported

11

there were a few jurors who refused to rule either way. The trial court then

addressed the jury regarding that issue:

> [This is], I think, a misapprehension or misunderstanding of your collective and individual obligations as a juror, okay? It is the obligation of each one of you to read the instructions, filter the evidence you've heard through those instructions, and then individually decide whether you would vote guilty or not guilty. At that point, if all of you agree on one or the other then we have a verdict. If all of you don't agree on one or the other, then you all will let me know and we'll go from there. But I can't have a situation where we have 12 jurors, but we only have some number fewer than 12 that are willing to vote. So, everyone has to review the instructions, because I think that with the issue that we're talking about here, what we find a lot of times is if everyone carefully reviews the instruction it usually answers the questions that people have. But we have to have a situation where each of you individually renders a verdict and what your verdict would be. If they aren't all the same then you all can knock on the door and let me know and we'll go from there. If they are all the same then we have a unanimous verdict in one direction or the other.

While it is true that an individual juror's duty to render a verdict is an element

of an *Allen* charge,[14] this statement could hardly qualify as giving the jury an

*Allen* charge. The court simply wanted to make clear that each juror has a

duty to vote one way or another.

In addition, even assuming arguendo that this was in fact an *Allen*

charge, the defense was the party who requested an *Allen* charge as an

alternative at that stage. When the trial court asked the defense how it wanted

to proceed, counsel replied that the *only* procedural options the court had were

---

[14] *See* RCr 9.57(c).

to either read the jury an *Allen* charge or declare a mistrial. Therefore, even if it was an *Allen* charge given in error, it would be invited error. In an analogous case, *Quisenberry v. Commonwealth*, the defendant requested a jury instruction on facilitation and cited the evidence that supported that instruction.[15] He was ultimately convicted of facilitation and subsequently argued to this Court that the evidence was insufficient to support that conviction.[16] This Court held that "[g]enerally, a party is estopped from asserting an invited error on appeal" and reasoned that the defendant's "express representation to the trial court that the evidence of facilitation was sufficient, waived his right to claim on appeal that it was not."[17]

Here, Wright requested an *Allen* instruction when the foreperson reported that some jurors abstained from voting but is now arguing that giving that *Allen* charge was error. This is not permitted under the invited error doctrine.

### ii.   The *Allen* Charges

Notwithstanding our conclusion that the first time the trial court addressed the jury was not an *Allen* charge, there can be no question that the second and third time the court addressed the jury were in fact *Allen* charges; the content of RCr 9.57 was read to them verbatim and in its entirety. Thus,

---

[15] 336 S.W.3d 19, 37 (Ky. 2011).

[16] *Id.*

[17] *Id.* at 37-38.

13

Wright's next argument is that giving multiple *Allen* charges coerced the jury into rendering a verdict.

To analyze whether giving an *Allen* charge was unduly coercive our test requires looking at the language of the statement or instruction "to determine whether it actually forced an agreement or whether it merely forced deliberations resulting in an agreement...we have long held that statements which merely impress upon the jury the propriety and importance of coming to an agreement do not rise to the level of reversible error."[18]

Here, the first time the jury reported itself to be deadlocked, the entirety of the trial court's instruction was:

> This is the protocol we go through at this time: there is an additional instruction that I am to read to the jury that has not been read yet and I'm going to read that instruction verbatim out of the rule without comment. In the event that a jury reports to the court that it is deadlocked this is the instruction I am to read: "(1) In order to return a verdict, each juror shall agree to that verdict. (2) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment. (3) Each juror must decide the case, but only after an impartial consideration of the evidence with the other jurors. (4) In the course of deliberations a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous. (5) No juror should surrender his or her honest convictions as to the weight or effect of the evidence solely because of the opinion of other jurors or for the mere purpose of returning a verdict." Now, that is the instruction when a jury reports it's

---

[18] *Commonwealth v. Mitchell*, 943 S.W.2d 625, 628 (Ky. 1997) (internal citations omitted).

deadlocked. At this time I'm going to ask you to return to the jury room and continue your deliberations.

The second time the jury reported it was deadlocked, the trial court first asked the foreperson if he believed further deliberations would be beneficial in accordance with RCr 9.54(1).[19] The foreperson believed it would. The court therefore stated the following to the jury:

> Your foreperson has informed us that you are still unable to reach a verdict. Now, that means I have to read this instruction to you again. I'm not doing this because I think you all have forgotten it, I'm doing this because I believe this is what the rules require that I do. So, if you'll bear with me, I'm going to read this instruction again and ask you to give it one more try. **None of us is asking for an arm twisting**, but there has been a lot to digest over the last couple of days and we want to make sure we give it all the time a case like this deserves. [re-reads the same instruction as listed *supra*]. Folks, with that in our heads, I'll ask you to return to the jury room and continue your deliberations. **I'm not asking for a specific amount of time. If and when you come to a decision one way or the other or convince yourselves you're at an intractable spot, then just let us know** and we'll go from there, okay?

(emphasis added).

There is nothing in either of these statements, or the circumstances surrounding their delivery, that convinces this Court that the jury was forced to reach a verdict. The trial judge specifically stated no one was trying to twist the jury's arm, or even that they should deliberate for a specific period of time.

---

[19] Though this Court has previously held RCr 9.57 does not mandate that a trial court question the jury or foreperson in order to determine whether further deliberations would be useful. *See Mitchell*, 943 S.W.2d at 627.

Further, the jury deliberated for a total of four hours, which cannot be considered a coercive factor. This is an instance where the *Allen* instructions were given merely to encourage continued deliberations. We therefore find no error.

Finally, because two *Allen* charges were given in this case, Wright advocates for the adoption of a bright-line rule that giving more than one *Allen* charge is *per se* coercive. This is a matter of first impression for this Court. Wright cites *United States v. Seawell*,[20] to support his argument. In *Seawell*, the Ninth Circuit held that "it is reversible error to repeat an *Allen* charge in a federal prosecution in this circuit after a jury has reported itself deadlocked and has not itself requested a repetition of the instruction."[21]

But Wright neglects the fact that the Ninth Circuit finds itself alone amongst the Federal Circuit Courts in having such a rule. *See United States v. Barone*, 114 F.3d 1284, 1305 (1st Cir. 1997) ("Although we sustain the district court in this case without much difficulty and decline to adopt a *per se* rule, we do think that caution needs to be used before the modified *Allen* charge is given for a second time."); *Campos v. Portuondo*, 193 F. Supp. 2d 735, 747 (S.D.N.Y. 2002), *aff'd*, 320 F.3d 185 (2d Cir. 2003) ("the Second Circuit has held that it 'do[es] not regard a repeated *Allen* charge as inevitably coercive.'"); *United States v. Santamaria*, 418 Fed. Appx. 197, 198 (4th Cir. 2011) ("Giving the jury a second *Allen* charge is not *per se* error."); *United States v. Fossler*, 597 F.2d

---

[20] 550 F.2d 1159 (9th Cir. 1977).

[21] *Id.* at 1163.

478, 485 (5th Cir. 1979) ("We do not elect to adopt such a *per se* rule. We opt instead to continue the practice of assessing the impact of the judge's statements in light of his language and the facts and circumstances which formed their context, just as we have previously done in evaluating the effect of a single *Allen* charge."); *United States v. Robinson*, 872 F.3d 760, 773 (6th Cir. 2017) ("Multiple *Allen* charges are not *per se* coercive."); *United States v. Reed*, 686 F.2d 651, 652 (8th Cir. 1982) ("we have nonetheless repeatedly rejected attacks on the *Allen* charges as *per se* coercive."); *United States v. Ailsworth*, 138 F.3d 843, 852 (10th Cir. 1998) ("We conclude that the district court did not err in giving the jury two *Allen* instructions[.]"); *United States v. Davis*, 779 F.3d 1305, 1313 (11th Cir. 2015) ("We have never adopted a *per se* rule against successive *Allen* charges.").[22]

Therefore, we hold no purpose would be served by the adoption of a *per se* rule. Instead, our appellate courts should address the issue of whether giving multiple *Allen* charges in any given case was coercive, and therefore reversible error, based on the totality of the circumstances surrounding the instructions given.

---

[22] No cases were found regarding the 3rd and 7th Circuits' stance on the issue. The Supreme Court of the United States has likewise not addressed the issue.

**D. Though the error was waived, the trial court's discussions with the foreperson were improper.**

Finally, this Court believes the record demonstrates a need for clarity on an issue not raised by Wright in this appeal. As previously discussed, on at least three separate occasions the trial court conversed with the foreperson out of the presence of the rest of the jury. These actions, though done in good faith, were a clear violation of RCr 9.74, which directs:

> No information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant (unless the defendant is being tried in absentia) and the entire jury, and in the presence of or after reasonable notice to counsel for the parties.[23]

Thus, though this error was waived by defense counsel's lack of objection to said discussions,[24] we reiterate that our trial courts are bound to follow RCr 9.74 and its corresponding case law.

## III.   CONCLUSION

For the foregoing reasons, we affirm the trial court below.

---

[23] *See also, e.g., Bell v. Commonwealth,* 245 S.W.3d 738, 742 (Ky. 2008) ("The trial court should never isolate one juror from the rest of the jurors for questioning on a matter which pertains to them all.").

[24] *See Skaggs v. Commonwealth,* 694 S.W.2d 672, 681 (Ky. 1985).

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, J.J.; sitting. All concur. Nickell, J.; not sitting.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Department of Public Advocacy
Frankfort, Kentucky

COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General of Kentucky
Frankfort, Kentucky