# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 29, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0105-MR

DYLAN CAPPS                                                  APPELLANT

ON APPEAL FROM FAYETTE CIRCUIT COURT
V.                  HONORABLE THOMAS L. TRAVIS, JUDGE
NO. 17-CR-00820

COMMONWEALTH OF KENTUCKY                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Dylan Andrew Capps (Capps) was convicted of one count of wanton murder, one count of first-degree assault, and two counts of first-degree wanton endangerment. He was sentenced to twenty-five years' imprisonment, and appeals his convictions to this Court as a matter of right.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In May of 2017, Daniel Childress (Daniel) was living at the Campus View Condominiums apartment complex in Lexington. Dezmon Cowan (Dezmon) and Brandon Walker (Brandon) were Daniel's roommates. On May 21st, Daniel discovered that Dezmon had stolen $100, a cellphone, some Xanax, and a

---

[1] Ky. Const. § 110(2)(b).

wallet from him. Daniel and Dezmon got into an argument, and Daniel made Dezmon leave the apartment.

On the morning of May 22, Daniel called his friend Jordan Wise (Jordan), who lived in Frankfort. Daniel told Jordan that he had been jumped. The evidence was unclear as to who jumped Daniel, but both parties agreed that the attack was a result of his altercation with Dezmon the previous day. Jordan then called Ravon Woodhouse (Ravon), a mutual friend of Jordan and Daniel, and told him what happened. Ravon also lived in Frankfort with his friends Keegan Newton (Keegan), Justin Jenkins (Justin), and Dustin Wilhite (Dustin). Together, the five of them—Jordan, Ravon, Justin, Dustin, and Keegan—decided to go to Lexington to either help Daniel or bring him back to Frankfort with them. Jordan drove the group in his silver Honda Accord.

The Commonwealth presented testimony from Ravon, Keegan, Daniel, and Jordan as to what happened that day. Because the accounts vary on the minutia of what occurred, we feel it is best to briefly recount their respective testimonies.

## Ravon Woodhouse

Ravon testified that before his group left Frankfort, they went to Walmart so that Ravon could purchase ammunition for his .380 caliber Hi-Point handgun. The bullets Ravon purchased were later found in a Walmart bag in Jordan's vehicle. Ravon said that he brought his gun with him because he did not know what to expect, but the gun remained in Jordan's trunk the entire

2

time. Officers later recovered Ravon's gun from the trunk of Jordan's car. Ravon said that Keegan also brought his gun, a .22 caliber AR.[2] Ravon stated that no one else in the group had a gun with them that day, though there was some dispute as to whether Dustin also had a gun.

After the group left Walmart, they went straight to Daniel's apartment in Lexington. On the way to Lexington, they smoked marijuana in the car, which Keegan and Jordan both acknowledged in their testimonies. When they arrived at Daniel's apartment Daniel was outside, and they got out to talk to him. Less than a minute after they arrived, Capps' vehicle, a gold/silver Suzuki SUV, pulled into the parking lot of the apartment complex. Ravon saw Dezmon, a "white dude," "a tall slinky black guy," and a "black chick" exit Capps' vehicle. Ravon recognized Dezmon, but did not know the other three individuals. The "white dude" was Capps, the "tall slinky black guy" was Kadariss Wallen (Kadariss), and the "black chick" was Ajane "AJ" Minnifield (AJ). AJ was Capps' girlfriend.

At first, Daniel's faction and Dezmon's faction were standing in the middle of the parking lot, facing each other, and arguing. Ravon did not remember anyone on either side having a gun out at that point. He then remembered AJ coming towards the middle of the two groups swinging a knife

---

[2] A task force officer that worked for the Bureau of Alcohol, Tobacco, Firearms, and Explosives through the Lexington Police Department testified that Keegan's gun was legally registered to him. The same officer attempted to trace Ravon's gun using its serial number, but the trace did not come back with any information. The officer stated this happens occasionally, particularly with brands like Hi-Point which produce inexpensive guns in high quantities.

and yelling "ain't gonna be no fight." AJ then cut Jordan's hand with the knife, and Jordan struck her. As soon as Jordan struck AJ, shots began to ring out in rapid succession. Ravon said the bullets were coming towards the back of Dezmon's group, and that he saw Capps shooting them. Ravon remembered that Capps' gun was a dark green pistol and identified it during his testimony. He remembered the first three shots Capps fired in particular because they struck Jordan, who was standing next to Ravon.

Ravon was scared, so he ran to a mechanic's shop one block away and asked them to call 911. That 911 call was played for the jury. Ravon then returned to the scene after he saw squad cars approaching, and cooperated with the police's investigation.

**Keegan Newton**

Keegan testified that when they got to Daniel's apartment, Daniel was outside with his girlfriend. They were talking to Daniel for approximately ten to fifteen minutes before Capps' SUV pulled into the parking lot. Capps parked in the first spot in the parking lot closest to the road, and backed the car in. Keegan saw three men and a woman get out of Capps' SUV; he said they got out of the vehicle "with a lot of rage" and he could tell "they were looking for a fight."

Capps had a pistol in his hand when he got out of his vehicle. Keegan therefore went to Jordan's car and got his gun. Then, someone from one of the two groups said, "let's just fight." Keegan took his gun back to Jordan's car, and everyone squared up to fight. Keegan said Capps began shooting after

4

someone was slapped; he said he was focused on arguing with Dezmon, and did not see who was slapped. After Capps started shooting, Keegan ran back to Jordan's car to get his gun. By the time he returned Jordan had been shot and was on the ground, and Capps was pulling out of the parking lot. Keegan was afraid that Capps might attempt to shoot Jordan again to "finish the job," so he fired a single round at Capps' vehicle. The bullet entered through the bottom of Capps' front passenger window and lodged in the middle of his dashboard. Keegan did not see anyone with a gun during the shooting apart from himself and Capps. He stayed at the scene and talked to the police when they arrived.

**Daniel Childress**

Daniel testified that he and Brandon were in the parking lot of the apartment complex talking to his group of friends that came from Frankfort when Capps' SUV pulled into the parking lot. Capps backed into the parking spot closest to the road. Capps had a pistol in his hand when he got out of his car, so Daniel told Keegan to go get Keegan's gun from Jordan's car. Keegan went to get the gun and then gave it to Daniel. Daniel was standing near Jordan's car holding Keegan's gun when Capps and Dezmon started to walk back towards Capps' vehicle. At that point, the clip accidentally fell out of Keegan's gun; Daniel put the clip back in and gave the gun to Keegan.

Not long after that, he saw AJ yelling and swinging a knife around. Daniel saw Jordan push AJ, and then saw Capps pull his gun out of his waistband and start shooting. Daniel ran towards the apartment building, but

5

looked back and saw Jordan on the ground bleeding. Daniel ran to Jordan and took his belt off to make a tourniquet for Jordan's leg. They then put Jordan into Brandon's car and Brandon drove him to the emergency room. Daniel remembered Keegan firing one shot, but could not remember at whom it was fired. Keegan was the one that found Justin between a car and a retaining wall in the parking lot. Daniel did not stay at the scene; he had his girlfriend drive him to Frankfort before police officers began arriving at the apartment complex.

**Jordan Wise**

Jordan was twenty years old at the time of the shooting. He testified that he could not remember who was swinging the knife. But he remembered the knife coming towards his face, blocking it with his hand, and being cut with it. He showed the jury the scar the knife left on his hand. Jordan struck the person wielding the knife immediately after being cut.

As soon as he struck the person with the knife, his "vision went white" and he could not see. When his vision returned, he remembered feeling "little flicks" on his leg and seeing smoke come out of a gun. He never saw who shot him. He realized he was shot, so he tried to run, but his femur had been shot in half. He therefore started to crawl towards his car, and remembered being shot again below his right buttock as he was crawling away. The next things he remembered were someone putting their belt around his leg, being carried, being put in a car, and arriving at the emergency room. After that, the next thing he could recall was his father's voice telling him Justin was dead.

6

Jordan explained that he was shot seven to nine times. His femur was broken in half, and he had to have nine surgeries including a skin graft. He now has a "drop foot," nerve pain, scars, and must occasionally use a cane to walk.

A consistent thread throughout the four eyewitnesses' testimonies was that none of them could remember where Justin was when the shooting occurred. As mentioned, he was found barely responsive between a car and a retaining wall in the parking lot. He was taken by ambulance to the hospital where he tragically passed away; he was nineteen years old. The medical examiner testified that a bullet entered through his right buttock, traveled through his hip bone and several blood vessels and lodged in his abdominal wall. He died from internal blood loss.

By happenstance, Detective Bill Brislin was in the area where the shootings occurred and heard the description of the suspect's vehicle through dispatch. He saw a vehicle matching the description of the suspect's vehicle come out of the apartment complex "on two wheels." Eventually, he and other officers conducted a traffic stop and Capps, Kadariss, and AJ were arrested without incident. Capps fully complied with the arresting officers' commands, and informed them his gun, a .40 caliber Smith & Wesson semiautomatic handgun, was in the vehicle. A knife was also recovered from the front passenger floorboard.

Fourteen .40 caliber shell casings were found at the scene. Thirteen of the casings were in the middle of the parking lot between a single row of parked

7

cars and the sidewalk of the apartment building. The fourteenth casing was later found on the hood of Capps' SUV at the base of a windshield wiper. A firearm and toolmark examiner with the Kentucky State Police positively identified all fourteen shell casings as being fired from Capps' gun. The firearms expert further testified that, in general, a shell would exit Capps' gun to the right and back. A single .22 caliber shell casing was also found in the parking lot, but he could not definitively say whether it was fired from Keegan's gun. A live .22 caliber round was also found near Jordan's vehicle, and Keegan's gun was found under a tree in the parking lot. No evidence at the scene came from a .380 caliber gun or any other gun. In addition to the firearm evidence, broken glass from Capps' SUV was found in the middle of the parking lot between the row of cars and the sidewalk. There was also a trail of blood in the parking lot from Jordan crawling on the ground. Finally, two projectiles from Capps' gun entered a ground level apartment, which was occupied by two individuals that were not involved in the altercation: Chad Goodrich and Kurt Brown.

Capps' defense at trial was that he acted in self-defense. He did not testify on his own behalf, but his two post-arrest interviews with Det. Brislin were played for the jury. In the first interview, Capps claimed that he did not have his gun on him when he got out of his vehicle at the apartment complex. He told the detective that as soon as he arrived at the apartment complex "all [he] heard was like six guns getting cocked," and everyone on Daniel's side had guns pointed at him. Being the only one with a gun, Capps realized he could

8

not win, so he convinced everyone that was with him to leave. As soon as he got in his vehicle to leave, he heard a shot hit his passenger side window. He then grabbed his gun, and started shooting back from the driver's seat out of the passenger side window. He said he knew he had fourteen rounds in his gun, and that he fired all fourteen.

In Capps' second interview, Det. Brislin challenged Capps on the portions of his story that did not comport with the other witness statements, including AJ's and Kadariss', and did not match up with the evidence at the scene. Specifically, the impossibility of all fourteen shell casings being found outside his vehicle if he fired them from inside the vehicle. Capps still claimed he acted in self-defense, but his story proceeded to change a few times as he was being confronted by the detective with evidence that did not match his story. Ultimately, he claimed that after AJ was punched twice, he heard someone "rack" a gun. He therefore went to get his gun from his car. He then heard another shot, pulled out his gun and shot three to four rounds outside his vehicle. He then got back in his vehicle and fired the remaining ten to eleven shots from inside his car out the front passenger window. He said he intended to aim at "the light-skinned guy with the AR," i.e., Keegan. He denied aiming at Jordan, who had struck AJ.

Based on the foregoing, the jury convicted Capps of the wanton murder of Justin Jenkins, the first-degree assault of Jordan Wise, and two counts of first-degree wanton endangerment in relation to Chad Goodrich and Kurt Brown, respectively.

9

Additional facts are discussed below as necessary.

## II.   ANALYSIS

### A. The trial court did not err by denying Capps' motion for a mistrial.

Capps' first argument to this Court is that Jurors 3057, 3234, and 3006 failed to disclose material information during voir dire, and that their failure to disclose prevented him from intelligently exercising his peremptory strikes. He asserts that this was structural error, and that the trial court therefore erred by denying his motion for a mistrial. After close inspection of the record, although Capps did make a motion for mistrial, his grounds for that motion were not the same grounds as he now presents to this Court. His arguments for reversal are therefore not properly preserved. Regardless, for the reasons that follow, we hold that the trial court did not err by denying Capps' motion for mistrial, and that Capps' right to intelligently exercise his peremptory strikes was not violated.

The events at issue occurred after the questioning of the venire was completed and after the selection of the jurors that ultimately sat on the jury, but before the jury was sworn. The trial court had completed calling juror numbers, and the twelve jurors and two alternates selected to sit on the jury were in the jury box. The defense brought a clerical error to the court's attention: two of the fourteen jurors that were selected were jurors upon which the defense had exercised peremptory strikes. The trial court promptly removed those two jurors from the jury box and replaced them with two eligible jurors.

10

Immediately after the clerical error was rectified, the trial court asked the parties if they had any objection to the jury. The Commonwealth said it did not, but the defense asked to approach the bench before it answered. The defense told the court that it appeared that Juror 3057 was about to burst into tears. The court had Juror 3057 approach the bench, and she explained through tears that she had a son that was in legal trouble, though not as serious as Capps'. She said that her son's court date was coming up and she did not think she could "decide the fate" of another young man. She said that the emotional weight of the situation had only just hit her as she was sitting in the jury box. The court had her return to the jury box so it could discuss the issue with counsel.

The trial court noted to counsel that the jury had not yet been sworn, and that they had two alternates. It then asked the parties for their thoughts. The Commonwealth asked that Juror 3057 be removed before the jury was sworn. The Commonwealth explained that she had experienced this issue before, and it ended up hanging the jury. Defense counsel said that he did not want Juror 3057 to be struck. He argued that Juror 3057 was just telling the court she believed it was going to be difficult for her, but that it was a murder trial and was therefore going to be difficult for all of the jurors. Defense counsel did not believe what she said was grounds to remove her.

The trial court then brought Juror 3057 back up to the bench for further questioning. As the court did this, the bailiff approached the bench and informed the court that two other jurors, Juror 3234 and Juror 3006, had just

11

realized that they knew each other. The court continued its questioning of Juror 3057. When asked if she could weigh the evidence fairly and impartially, she was uncertain at best. First, she said she could. Then, she said she wanted to do her civic duty, but she did not think she could. Then she again said that she could, and asked to stay on the jury.

After having Juror 3057 return to her seat, the court told defense counsel that he was going to have to remove her because she was "just too shaky." Defense counsel said he understood but noted his objection for the record. Defense counsel then made a motion for mistrial. Specifically, he argued:

> Judge, if I could just for the record, I've never come across this. So I think just for the purposes of the record, I would move for a mistrial based upon the two issues with the juror (sic) having two people in the box and out and then now with this lady in the box and then deciding that she wants to answer a question in a different way than she previously answered the question. I think for the purposes of the record I have to make that objection.

The trial court then interviewed Jurors 3006 and 3234 individually. Juror 3006 said that he did not see Juror 3234 until they were in the jury box together. He explained that he used to work with her, though not directly. He would see her a couple of times a week at work in passing. She had retired one and a half years ago, and he had not seen her at all since she retired. Juror 3006 told the court he did not believe it was an issue, but wanted to bring it to the court's attention in fairness to the questions asked during voir dire. When the court asked him if he could exercise independent judgment without

12

worrying what Juror 3234 might think, Juror 3006 did not hesitate in saying yes. He said that he was very independent minded, as was she.

Juror 3234 echoed the same sentiments during her questioning. She explained that she had not seen Juror 3006 throughout voir dire until they were in the jury box together. Juror 3234 said that she and Juror 3006 had worked at the same bank in different departments, but did not associate socially outside of work. She said that she would have no trouble exercising independent judgment during deliberations, and that if Juror 3006 were to disagree with her about something it would not bother her.

Once both jurors returned to the jury box, the trial court asked defense counsel if he wanted to revisit his motion for mistrial. Defense counsel replied,

> I still have the motion judge. I just think that's a whole lot of confusion and issues with the jury at this point and stage, I mean people in the box it's…it's unfamiliar territory for me. I can't cite check a case or give you some kind of authority, it's just super weird and if I don't make some kind of a record to say that this is weird and is potentially prejudicing my client, throwing things off, I'm not doing my job.

The Commonwealth responded by reiterating that the jury had not been sworn yet. Further, it argued that, while it had been an unusual selection process, nothing had happened to taint the jury's impression of what the evidence would be that would prevent Capps from receiving a fair trial. The trial court agreed with the Commonwealth and overruled the defense's motion for mistrial. The trial court further ruled that it would allow Juror 3234 and Juror 3006 to remain on the jury as it appeared that they could be impartial and decide the

13

case independently from one another. Defense counsel then made another mistrial motion with regard to Juror 3057. He stated,

> I would make another motion with respect to her outburst in front of the jury. That could taint the jury with respect to moving forward. Especially with it being at the stage that it was, it's different when we first come in and there's 75 people as opposed to when she's in the box.

The trial court also overruled that motion for mistrial.

As stated *supra*, Capps now argues before this Court that the failure to disclose by Jurors 3057, 3234, and 3006 during voir dire prevented him from intelligently exercising his peremptory strikes. Therefore, he argues, structural error occurred, and he is entitled to a new trial. We will address his arguments regarding Juror 3057 and Jurors 3234 and 3006, in turn.

First, Capps argues to this Court that Juror 3057's failure to disclose that her son had an upcoming court date violated his due process right to intelligently exercise a peremptory strike on her. In other words, the harm he is alleging was his inability to use a peremptory strike upon her during voir dire based on that information. But defense counsel was given the opportunity to remedy that alleged harm and explicitly chose not to. The trial court asked both parties what they wanted to do about Juror 3057, and the Commonwealth argued strongly that she should be removed from the jury. Instead of taking the opportunity to have Juror 3057 removed by agreeing with the Commonwealth, thereby remedying the harm he alleges to this Court, the defense disagreed and argued that she should remain on the jury and be sworn. Thus, Capps argued to the trial court that Juror 3057 should have

14

remained on the jury, but now argues to this Court that his due process rights were violated because he could not remove her from the jury by exercising a peremptory strike upon her. Appellants are not permitted to feed one can of worms to the trial court and another to an appellate court.[3] We therefore will not address his arguments regarding Juror 3057.

We also question the preservation of Capps' argument regarding Jurors 3234 and 3006. The only basis for his mistrial motion with regard to them was the overall "weird" nature of the jury selection process, i.e., that two jurors were mistakenly chosen and then removed from the jury box and that Juror 3057 was selected and was also going to be removed from the jury box. He did not say that Juror 3234's and 3006's failure to disclose that they knew one another had prevented him from exercising a peremptory strike on them, nor did he argue that he would have struck them if he had known that information. He likewise did not argue to the court that they should be removed after they disclosed that they knew one another. Nonetheless, we hold that his right to intelligently exercise a peremptory strike on them was not violated.

In *Gullet v. Commonwealth,* this Court addressed whether an appellant was entitled to a new trial based on the intentional deceitfulness during voir dire of a juror who ultimately became the foreperson.[4] Gullet argued that the juror "improperly withheld material information which would have justified a for-cause challenge or would have prompted Appellant to use a peremptory

---

[3] *Henson v. Commonwealth,* 20 S.W.3d 466, 470 (Ky. 1999).

[4] 514 S.W.3d 518 (Ky. 2017).

15

challenge against her."[5]  To address this argument, the Court reiterated the

well-established rule that

> to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.[6]

The Court went on to note that "[o]ften, existing bias or prejudice cannot be

exposed by simply reversing the false answer to one question."[7]  Therefore,

"[t]he test for obtaining a new trial…may also be satisfied by showing that the

juror's dishonesty prevented inquiry into a critical subject that may have

exposed a disqualifying bias or prejudice."[8]

Thus, in this case, Capps must either (1) demonstrate that Jurors 3006

and 3234 failed to honestly answer a material question, and further show that

a correct response would have provided a valid basis to strike them for cause;

or (2) demonstrate that, Jurors 3006's and 3234's failure to disclose that they

knew each other during voir dire prevented inquiry into a critical subject that

may have exposed a disqualifying bias or prejudice.

---

[5] *Id.* at 520-21.

[6] *Id.* at 524 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 850, 78 L. Ed. 2d 663 (1984)).  *See also, e.g., Brown v. Commonwealth*, 174 S.W.3d 421, 430 (Ky. 2005) ("It is well settled that to obtain a new trial because of juror mendacity, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.").

[7] *Gullet*, at 525.

[8] *Id.*

16

Under the first *Gullet* test, we can hardly characterize what occurred as Jurors 3006 and 3234 failing to answer a material question honestly. Rather, they were simply unable to inform the parties that they knew each other during voir dire because they had not yet seen each other. Then, immediately upon recognizing one another, they informed the court about their past association. But, even assuming arguendo that they failed to honestly answer a material question, the information they ultimately disclosed would not have been valid grounds to strike either juror for cause.

Kentucky Rule of Criminal Procedure (RCr) 9.36 provides that a prospective juror shall be removed for cause "when there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence[.]" As this Court has addressed in numerous cases, this rule is exclusionary in nature, and when there is uncertainty about whether to strike a juror for cause, that juror should be stricken.[9]

In this case, if Jurors 3234 and 3006 would have disclosed that they knew one another during voir dire, it would not have provided valid grounds to strike either for cause. As they explained to the trial court, they were work acquaintances that did not work in the same department and did not socialize outside of work. Further, Juror 3234 had been retired for one and a half years, and Juror 3006 had not seen her since she retired. Both independently confirmed that their ability to fairly try the case would not be affected by the

---

[9] *See, e.g., Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013).

17

presence of the other. Accordingly, there would have been no reasonable grounds to believe that they could not have rendered a fair and impartial verdict on the evidence. Capps' argument therefore fails the first *Gullet* test.

In the same vein, Capps has failed to demonstrate that failing to disclose that they knew one another prevented inquiry into a critical subject that may have exposed a disqualifying bias or prejudice. After the jurors disclosed that they knew one another, the trial court did in fact conduct an inquiry into the circumstances of their relationship, and no disqualifying bias or prejudice was discovered. Accordingly, Capps' argument fails the second *Gullet* test.

We therefore hold that Capps' due process right to intelligently exercise his peremptory strikes was not violated.

## B. The alleged errors regarding Det. Brislin's testimony do not require reversal.

Capps next asserts that two errors requiring reversal occurred during Det. Brislin's testimony. The first alleged error is that Det. Brislin expressed an opinion as to the ultimate issue in the case, i.e., that he improperly expressed his opinion that Capps was guilty. The second alleged error is that Det. Brislin improperly summarized his interviews with Capps in violation of the best evidence rule. Therefore, as a preliminary matter, we must recount the relevant portions of Det. Brislin's testimony.

During direct-examination, Det. Brislin explained why he interviewed Capps twice on the day of the shootings. The first interview was at approximately five o'clock in the evening shortly after Capps was arrested. The second interview was conducted around four hours later after the detective had

18

spoken to several other witnesses and reviewed evidence from the scene.

Recordings of both of Capps' interviews were played in their entirety for the jury.

After Capps' first interview was played, the following exchange occurred between the Commonwealth and Det. Brislin:

> **CW:** Now, some parts [of the interview] are a little bit difficult to hear. Would you mind to tell the jury, in a nutshell, what that conversation was about?
>
> **Det.:** Yeah, I'll summarize it. As I stated earlier, what I was trying to attain was just a baseline from Mr. Capps about what had occurred out there. A summary of that interview would be that I interviewed him for twenty minutes. During that interview he stated that he was basically going to this location armed in case other people brought guns as well, it was his understanding that they were going to fight, it was all over a dispute that had occurred the day before. As he had mentioned, and as I had mentioned and learned, as they arrived there was some arguing going on in the parking lot. Mr. Capps stated they had parked in a parking spot in the front of the parking lot, which is accurate, and backed in. Mr. Capps stated that as the argument went on and as he arrived, he heard what the thought was several guns being cocked or chambered in the parking lot. As he described, he thought it to be six guns from what I recall, and he only had one gun, so Mr. Capps was trying to get everyone that he had brought to that location to leave. Basically, saying he was out gunned. A dispute happened between AJ and an unknown individual; I think he described it as being pushed. And then he stated that as they were in the car trying to leave, he heard a gunshot shattering the passenger side window where AJ was positioned. It was at that point that Mr. Capps armed himself with his handgun, I think he stated that it
>
> was under the seat and then began firing from inside the vehicle outside the passenger side window in the direction of the individuals. He described an individual being armed with a long gun, an AR style rifle is what he saw specifically. Mr. Capps described some other pistols as well. As he was firing [his finger] was injured with some broken glass that had shattered. Mr. Capps described eventually fleeing the scene, being followed by me

19

as I described earlier in the unmarked vehicle thinking I was with the opposing group and then cooperating with law enforcement during the traffic stop, complying with our commands, providing information at the scene that there was a handgun in the car and then being brought to police headquarters to be interviewed, and that was the first interview.

Det. Brislin then explained that at the time of the first interview he had no evidence to contradict Capps' story.

Det. Brislin next testified that, following his first interview with Capps, he interviewed several other eyewitnesses, including AJ and Kadariss, and reviewed photos from the crime scene. Both AJ's and Kadariss' stories and the photographic evidence were inconsistent with Capps' claim of shooting all fourteen rounds from inside his vehicle. Det. Brislin therefore wanted to ask Capps more "challenging questions" in the second interview. The second interview was played in full for the jury, and then Det. Brislin testified as follows:

> **CW:** Can you summarize that second conversation with the defendant that you had?
>
> **Det:** To summarize this interview, there are some differences, and I'm sure you saw that. The interview began with me asking him to explain what happened again. He told the same story as the interview from before which was that they went over there, he saw individuals with guns. I think one of the differences in this interview is that he's describing seeing three guns instead of the original six that he stated in the first interview with us. He described those guns in detail to be a long gun and two pistols
>
> from what he recalled. Mr. Capps stated as he had before that they got there, his girlfriend AJ was pushed, I asked wasn't she punched or something along those lines. He stated yes. I also asked him about a knife which wasn't mentioned before. Mr. Capps agreed that she (AJ) had a knife that he believed to be in her pocket. So, he then stated again that after she (AJ) was assaulted,

20

[he] got in the car, the window was busted out by the shot, and then [he] emptied his gun, shot at the individuals in the parking lot. So, basically stating that the original interview with us was about the same as this interview. So then at this point in the interview, as you may recall, I started asking him questions about things that just weren't adding up as far as the physical evidence that I was seeing and had learned from forensics and also information I'd learned from other witnesses. And to summarize that, I kind of challenged him about firing from inside the car and I think I told him that AJ is telling us something different. You saw Mr. Capps then describe firing from outside the car and stated that he did fire from inside the car and continues to change his story somewhat to now he's heard two shots, and then it was only after the first shot when he returned fire outside the car and then when he returned to the car then the window was shot out was when he fired the rest of his rounds from inside the car. Which, from an evidentiary side of things that was not correct or accurate from what I was seeing. Mr. Capps continued to describe in that interview that it was a dispute over some stolen money, which was accurate, and Mr. Capps again showed us in that interview how he was kind of positioned on the driver's side shooting from inside the car.

At the end of the second interview, Capps was left alone in the interview room for some time. Det. Brislin then returned with another detective. The detectives inform Capps for the first time that he shot two people, one died, and the other was in critical condition. They told him he was being placed under arrest for murder and first-degree assault because there were still questions to be resolved regarding who fired the first shot and self-defense. The Commonwealth questioned Det. Brislin about this discussion:

**CW:** And there's a short conversation that you have at the end there with Det. McCowan, can you explain that to the jury?

**Det.:** Det. McCowan and I excused ourselves from the interview room, this is common, it's nothing different than what usually happens. So, we excuse ourselves from the room. At this point, from what I recall, I spoke with my boss, we discussed the charges, discussed the case. As Mr. Capps stated, he was firing his

21

weapon, as he said he felt that he and his friends were in fear of their lives. But his intended target as he stated in the interview was the individual with the long gun. Well that individual was never struck, these other individuals were struck several times, one being the deceased and the other that suffered the multiple gunshots. So, as we discussed all of that we had a pretty good understanding of what we think a charge would be if there are charges needed at that point. So I believed I had probable cause to file charges against Mr. Capps for the murder of Justin Jenkins and we didn't know the outcome of what Jordan Wise would be, the victim that was shot multiple times. We knew that he was seriously injured so that was the representation for the assault in the first degree charge. So we filed those charges against him based on what I knew at the time and based on the extensive investigation I felt I had completed from the time that I followed him to the time of the secondary interview. Also based on his statements and other statements. And, you know, those charges are completed at that time, but I also go through a series of checks and balances through the court system to make sure these charges are appropriate, and they're cited by a judge and cited by jurors just like you. So here we are today so it's obvious that my charges I had probable cause for to charge this individual Mr. Capps based on the information and evidence I had for the murder of Justin Jenkins and the assault of Jordan Wise, and there was an additional charge that comes at the grand jury that I think [the Commonwealth] will probably ask me about. So that's why we're here today.

Det. Brislin then stated that his investigation continued until trial and the various actions that investigation entailed. The Commonwealth asked about Det. Brislin's involvement in the grand jury indictment. Specifically, how the two counts of first-degree wanton endangerment against Capps came to be, which had not yet been explained to the jury:

**CW:** And did you present this case to the Fayette County Grand Jury in July of 2017?

**Det.:** I did.

**CW:** And at that time did you present charges against the defendant for murder and assault in the first degree.

22

**Det.:** Mhm, I did.

**CW:** And did you also present evidence about wanton endangerment first degree as it related to the occupants of apartment 101 at Campus View Condominiums?

**Det.:** I did.

**CW:** And so those people, Chad Goodrich and Kurt Brown?

**Det.:** Yes ma'am.

**CW:** And did the jury elect to indict the defendant for two counts of wanton endangerment first degree for them?

**Det.:** Yes.

**CW:** That's all the questions I have for you right now.

Defense counsel then conducted a very thorough cross-examination of Det. Brislin. On re-direct, the Commonwealth asked Det. Brislin to explain why he charged Capps with murder, and he responded:

> So I charged Mr. Capps with murder and that was based on, so you saw the two interviews, so where that came from was from what I believe to have been probable cause there was enough evidence to charge him. And so I did, which was for the intentional act of shooting and killing an individual, a human being, Justin Jenkins, and seriously injuring Jordan Wise. But the charge itself, in his interview if you recall he stated he was firing at the individual who was armed, which is in this case Mr. Keegan Newton. Well Mr. Newton was never struck. I felt that based on [Capps'] knowledge of his handgun, he openly carries it on a daily basis, he goes to the [shooting] range several times, seemed to be familiar with his weapon to be accurate enough to tell me how many times he fired it and how many bullets were in it. But when he openly fired his weapon, whether it was the intended target of the individual with the long gun or not, he intentionally pulled the trigger, fired that weapon enough times to strike Mr. Wise several
>
> times and ultimately killing Mr. Jenkins. With that act I believe that's enough for murder based on his conduct of choosing to do that. It's an unfortunate situation but that's the law, or that's the way I saw it that day.

23

After this testimony, defense counsel requested "an admonition as to [Det. Brislin] answering the ultimate issue question and saying, 'that's the law' when his job is only probable cause, not it's the law that this is murder." The Commonwealth had no objection, and the trial court gave the jury the following admonition:

> Ladies and gentlemen, not too long from now, probably tomorrow, you'll be provided with the written instructions in this case which will set forth what the law is in the Commonwealth of Kentucky. And you will be charged with applying the facts of this case to the law and the law as described in those instructions. But ultimately, that question is up to you when and if you reach a verdict in this case.

We also note that both the defense and the Commonwealth explained to the jury during their respective closing arguments that the jury alone decides what the law requires, not Det. Brislin. With the foregoing in mind, we will address each of Capps' arguments.

Capps first argues that Det. Brislin improperly implied his belief that Capps was guilty. In particular, he asserts that Det. Brislin expressed a belief that Capps did not act in self-defense, which was the ultimate issue to be determined by the jury. Capps contends that Det. Brislin's testimony that he had probable cause to file charges against Capps, and that he presented the case to a grand jury and Capps was indicted, improperly "excluded Capps from the group of persons who acted in self-defense" and implied that the jury should find him guilty.

24

Capps' brief to this Court concedes that this issue was not properly preserved, and requests review for palpable error.[10] While we acknowledge that defense counsel only objected to Det. Brislin's statement regarding what the law was, we believe defense counsel's request for an admonition to disregard Det. Brislin "answering the ultimate issue question" was sufficient to preserve this issue for our review.[11] Nonetheless, Det. Brislin's testimony does not require reversal.

Capps primarily relies on three cases in support of his argument: *Nugent v. Commonwealth*,[12] *Bussey v. Commonwealth*,[13] and *Ordway v. Commonwealth*.[14] However, each of these cases is distinguishable from the case now before us.

In *Nugent,* the appellant Nugent was convicted of murdering Clark Kelly (the victim).[15] The victim's body was found on the premises of the Nugent Sand Company, which was owned by Nugent's family and was Nugent's employer.[16]

---

[10] RCr 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

[11] RCr 9.22 ("[I]t is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which that party desires the court to take or any objection to the action of the court, and on request of the court, the grounds therefor[.]").

[12] 639 S.W.2d 761 (Ky. 1982).

[13] 797 S.W.2d 483 (Ky. 1990).

[14] 391 S.W.3d 762 (Ky. 2013).

[15] *Nugent,* 639 S.W.2d at 762.

[16] *Id.* at 762-63.

On appeal to this Court, Nugent argued that the trial court erred by "admitting opinion evidence as to Nugent's guilt."[17]

One of the Commonwealth's witnesses at trial was an employee of the Nugent Sand Company.[18] That witness gave two statements to police.[19] During direct-examination, the witness' first statement was not discussed, and his second statement was used only to refresh his memory.[20] During cross-examination, the defense attempted to impeach the witness' credibility by introducing a hand-written change made to the witness' second statement.[21] The change described Nugent's statement to the witness that the victim was going to be dead when he was found.[22] The defense emphasized the witness' statement to the interviewing officer that he had always wanted to be a police officer in an attempt to suggest that the witness "was playing detective in the investigation of the [victim's] murder, and in so doing, had been influenced by the police. Specifically, defense counsel was attempting to show the witness' state of mind at the time of the first statement."[23] The Commonwealth believed that in doing so the defense opened the door to evidence about the witness'

---

[17] *Id.* at 762.

[18] *Id.* at 764.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

state of mind.[24]  It therefore introduced a previously undiscussed portion of the witness' statement wherein the interviewing officer asked the witness if he believed that Nugent "dropped the hammer" on the victim.[25]  The witness replied "I think he did, you know if you want the honest to God truth."[26]

This Court held that "[c]learly, [the witness'] opinion as to [Nugent's] guilt is not admissible."[27]  It reasoned:

> [e]ven if the statement is technically admissible into evidence, it is obvious that the purpose was incompetent.  The issue of guilt or innocence is one for the jury to determine, and an opinion of a witness which intrudes on this function is not admissible, even through a route which is, at best, "back door" in nature…Due to the nature of the evidence, and its highly prejudicial effect on the jury, we believe the trial court erred in admitting the evidence.[28]

Consequently, this Court reversed Nugent's conviction.[29]

In *Bussey*, the next case cited by Capps, Bussey was convicted of sexually assaulting a fifty-year-old, mentally handicapped man (the victim).[30]

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* (citing *Kennedy v. Commonwealth*, 77 Ky. (14 Bush) 340, 359 (1878) (holding that a defendant's guilt "is for the jury, and upon which the opinion of witnesses is not competent"); *Koester v. Commonwealth*, 449 S.W.2d 213, 216 (Ky. 1969) (holding that a psychiatrist's testimony by avowal that the defendant lacked the specific intent to have sexual intercourse with the eleven and twelve year old victims was properly excluded); *Deverell v. Commonwealth*, 539 S.W.2d 301, 301-02 (Ky. 1976) (holding that, in an "exhibiting an obscene movie" case, the police officer's testimony that was, in essence, commentary during the film about why he believed it was pornography was reversible error)).

[28] *Nugent*, 639 S.W.2d at 765 (internal citations omitted).

[29] *Id.* at 766.

[30] *Bussey*, 797 S.W.2d at 484.

The victim claimed he requested a ride from Bussey and Bussey's brother, both of whom the victim knew.[31] The victim alleged that Bussey sexually assaulted him in the vehicle and then dropped him off at his intended destination.[32] Bussey's defense at trial was that the sexual assault did not occur.[33]

On appeal to this Court, Bussey asserted that the trial court erred by allowing an officer "to testify as to an inadmissible conclusion."[34] Though the Commonwealth argued otherwise, the Court believed the issue was preserved: "we believe the objection was properly brought to the attention of the trial court and that **the trial court overruled the objection**, albeit in ambiguous terms."[35]

During direct-examination, the officer was asked "whether he had come to a conclusion that the victim had been taken against his will to the scene where the sexual abuse occurred."[36] The officer responded, "[y]es. I came to the conclusion that there had to have been some type of misconduct or I would not have received a complaint."[37] The officer then explained that "departmental policy required him to report his findings to a captain to continue with an investigation."[38]

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at 485.

[35] *Id.* (emphasis added).

[36] *Id.*

[37] *Id.*

[38] *Id.*

This Court concluded that there was little doubt that the officer's statement "amounted to a declaration that he believed the story told by the victim," and that in a number of cases such a declaration has been held to be error.[39] The Court discussed that the case presented "what appears to be a nearly perpetual source of confusion, the so-called 'investigative hearsay exception' to the hearsay rule."[40] The Court stated it thought it laid the issue to rest in *Sanborn v. Commonwealth,* 754 S.W.2d 534, 541 (Ky. 1988), and reiterated its holding therein:

> [t]he rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information [*and*] taking of that action is an issue in the case. Such information is then admissible, not to prove the facts told to the police officer, but only to prove why the police officer then acted as he did. It is admissible *only* if there is an issue about the police officer's action.[41]

The *Bussey* Court accordingly held that even if the officer's belief in the victim's allegation explained why he reported it to his superior, "his taking of that action was not an issue in the case as required by the decision in *Sanborn.*"[42] The Court therefore reversed Bussey's conviction based on the trial court's admission of the officer's testimony.[43]

---

[39] *Id.* (citing *Nugent, supra, Koester, supra,* and *Deverell, supra*).

[40] *Id.* at 486.

[41] *Id.*

[42] *Id.*

[43] *Id.*

In the final case, *Ordway*, Ordway was convicted of capital murder in relation to the shooting deaths of two of his associates.[44] At trial, Ordway claimed he acted in self-defense.[45]

Before this Court, Ordway argued that the trial court erred by allowing a detective to testify that "from his experience investigating self-defense related homicides, how persons who legitimately exercise the right of self-protection typically behave," and that Ordway "did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense."[46] During the detective's testimony, defense counsel objected three times and ultimately requested a mistrial.[47]

The *Ordway* Court noted that the determination of a defendant's guilt must be based on the evidence presented and cannot be extrapolated from an opinion about how a defendant's behavior differed from how a "typical" suspect behaves.[48] This Court believed that the detective's testimony "in effect, urged the jury to depend upon his apparent expertise as a police officer and his perception and opinion about matters outside the realm of common knowledge."[49] Accordingly, the Court held that the detective's

> testimony contrasting his opinion on the habits of suspects who, as a class, have truthfully invoked the defense of self-protection

---

[44] *Ordway*, 391 S.W.3d at 772-74.

[45] *Id.* at 771.

[46] *Id.* at 775.

[47] *Id.*

[48] *Id.* at 776.

[49] *Id.* at 776-77.

against the class of those who have lied about it, and how [Ordway's] post-shooting conduct was consistent with the latter, should have been excluded as improper opinion testimony and irrelevant.

The opinion of an experienced and respected police detective that [Ordway's] conduct did not match the stereo-typical conduct of an innocent person acting in self-defense authoritatively portrayed [Ordway's] defense as a fabrication. That testimony was clearly devastating to Appellant's claim of self-defense, and accordingly, we are unable to conclude that the inadmissible evidence was harmless.[50]

This Court therefore reversed Ordway's convictions based upon the trial court's admission of the detective's testimony.[51]

Each of three foregoing cases is clearly distinguishable from the facts of this case for at least two reasons. To begin, in each of those cases testimony was presented by a witness about their belief in the defendant's guilt: in *Nugent*, a lay witness testified that he believed Nugent "dropped the hammer" on the victim;[52] in *Bussey*, an officer testified that he believed "there had to have been some type of misconduct";[53] and in *Ordway*, an officer testified that, based on his experience, Ordway did not act like someone who acted in self-defense, but instead acted as though he was fabricating a self-protection defense.[54]

---

[50] *Id.*

[51] *Id.* at 775.

[52] *Nugent,* at 764.

[53] *Bussey,* at 485.

[54] *Ordway,* at 775.

Here, Det. Brislin never stated that he believed Capps was guilty of any of the crimes he was charged with. Rather, he consistently explained why he believed he had *probable cause to arrest him.* Probable cause sufficient to arrest someone and guilt beyond a reasonable doubt are two completely different standards of proof. And, our juries are intelligent enough to know that if a defendant is on trial, there was obviously probable cause to arrest or indict him for the crimes he is accused of committing.

And, more importantly, unlike in *Nugent*, *Bussey*, and *Ordway*, Capps requested and received an admonition regarding the detective's testimony. In each of the three cases cited by Capps, the testimony regarding belief in the defendant's guilt came in *over the defense's objection.* Here, Capps received the exact relief he requested: a curative admonition that Det. Brislin's belief that he had probable cause to arrest Capps had no bearing on the jury's ultimate decision regarding Capps' guilt. This admonition was then further bolstered when both the defense *and* the Commonwealth told the jury during closing arguments that the jury, not Det. Brislin, would determine whether Capps was guilty beyond a reasonable doubt under the law.

> A jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error. There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a
>
> strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was

32

asked without a factual basis and was inflammatory or highly prejudicial.[55]

We do not believe that either of the foregoing exceptions is present in this case. As mentioned previously, jurors are sophisticated enough to understand the difference between probable cause to arrest or indict and guilt beyond a reasonable doubt. We therefore believe that the jury in this case was able to understand that Det. Brislin was merely explaining why he believed he had probable cause to arrest Capps. There is accordingly no overwhelming probability that the jury could not follow the court's directive—which was echoed by both the defense and the Commonwealth—that they would ultimately decide Capps' guilt or innocence independently of Det. Brislin's testimony. We likewise do not believe the question asked by the Commonwealth, i.e., why the detective believed he had probable cause to arrest Capps, was asked without a factual basis or was highly inflammatory and prejudicial. Finally, the detective's bases for believing he had probable cause to arrest Capps were all taken directly from what Capps told him in his interviews, which were both played in full to the jury.

Based on the foregoing, we hold that Det. Brislin's testimony regarding his belief that he had probable cause to arrest Capps does not warrant reversal. Nor does his testimony that he presented evidence to a grand jury, which ultimately indicted Capps, warrant reversal.

---

[55] *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003) (internal citations and quotation marks omitted).

33

Capps' final argument is that Det. Brislin improperly summarized his interviews with Capps in violation of the best evidence rule. We agree with Capps' contention that this alleged error was not preserved for our review, as defense counsel did not object to Det. Brislin's summarization of his first and second interviews with Capps. We therefore review for palpable error,[56] as requested by Capps.

Capps contends that "[t]he best evidence was not Brislin's summaries. Rather, the best evidence was the testimony from people who were actually present that day and Dylan Capps' interviews."[57] But the Commonwealth did not fail to present the "best evidence" of what occurred that day: Ravon, Keegan, Daniel, and Jordan all testified, and both of Capps' interviews were played in full for the jury. The detective's summaries were consistent with what the jury had already heard during Capps' interviews. The detective's summarization of his interviews with Capps can therefore best be described as cumulative evidence. Accordingly, even if we were to view their admission as error, the error would be harmless.[58]

---

[56] RCr. 10.26.

[57] We note that in his brief to this Court, Capps implies that the trial court said it "got a little queasy" about Det. Brislin's summarization of his interviews with Capps. However, closer inspection of the record reveals that that statement had nothing to do with Capps' interviews. Rather, the Court used the phrase when the parties were disputing whether a portion of Keegan's interview with Det. Brislin should be played for the jury based on their disagreement about what Keegan said during that interview.

[58] *See, e.g., Combs v. Commonwealth*, 965 S.W.2d 161, 165 (Ky. 1998) ("It is the holding of this Court that the admission of the results of a blood test in a DUI case not involving death or physical injury is improper. However, due to the overwhelming evidence of Combs' intoxication at the time of his arrest, the blood test evidence was merely cumulative and, thus, harmless error in this case."); *Meadows v.*

# III. CONCLUSION

Based on the foregoing, we affirm.

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Julia K. Pearson
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Lauren Lewis
Assistant Attorney General

---

*Commonwealth*, 178 S.W.3d 527, 538 (Ky. App. 2005) ("Even if we were to consider this error, we would deem the admission of this evidence to be harmless error. Meadows conceded that the impermissible hearsay testimony was cumulative of other evidence.  And the admission of inadmissible hearsay testimony that is cumulative is harmless error.").